UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                            :

ANGEL RIVERA                :           3:12 CV 914 (JGM)
                            :

V.                            :
                            :

CAROLYN W. COLVIN,[1]     :
ACTING COMMISSIONER OF   :
SOCIAL SECURITY        :
                            :          DATE: OCTOBER 8, 2013
-------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING AND/OR
REMANDING THE DECISION OF THE COMMISSIONER AND ON DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER

      This action, filed under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§

405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff disability insurance benefits ["DIB"].

## I.  ADMINISTRATIVE PROCEEDINGS

      On February 16, 2010,  plaintiff Angel M. Rivera, applied for DIB benefits claiming that he

was disabled between his onset date of June 26, 2003 and his date last insured of December 31,

2008, due to back and neck problems, right shoulder problems and psychiatric problems.  (Certified

Transcript of Administrative Proceedings, dated October 15, 2012 ["Tr."] 126-39).  The

Commissioner denied plaintiff's application initially and upon reconsideration.  (Tr. 78-85; see Tr.

75).  On June 23, 2010, plaintiff filed a request for a hearing before an Administrative Law Judge

["ALJ"] (Tr. 86-87; see Tr. 88-91), and on January 18, 2011, a hearing was held before ALJ

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g): "Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of the Commissioner of Social Security or any vacancy in such office."

Kenneth G. Levin, but plaintiff did not attend.  (Tr. 66-74, 100; <u>see</u> Tr. 95-98).[2]  A rescheduled hearing was held on February 25, 2011 before ALJ Levin, at which a vocational expert and a medical expert testified. (Tr. 31-65; <u>see</u> Tr. 101-10).  Plaintiff has been represented by counsel throughout the administrative process, and he is now represented on this appeal. (Tr. 76-77, 111; <u>see</u> Tr. 92).  On March 14, 2011, ALJ Levin issued a decision unfavorable to plaintiff, finding that plaintiff has not been under a disability at any time from June 26, 2003 through December 31, 2008. (Tr. 16-27).   On May 1, 2012, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3; <u>see</u> Tr. 14-15).

On June 21, 2012, plaintiff, proceeding <u>pro se</u>, filed his complaint in this pending action (Dkt. #1),[3] and on October 26, 2012, defendant filed her answer.  (Dkt. #11; <u>see also</u> Dkt. #29). Counsel filed her appearance in December 2012, and on March 1, 2013, plaintiff filed his Motion to Reverse the Decision of the Commissioner, and brief in support.  (Dkt. #24; <u>see</u> Dkts. ##21, 23). On April 30, 2013, defendant filed her Motion to Affirm the Decision the Commissioner, and brief in support, along with a certified copy of the administrative transcript, dated October 15, 2012. (Dkts. ##28-29; <u>see also</u> Dkts. ##25-26).

Accordingly, for the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #24) is <u>denied</u>, and defendant's Motion to Affirm (Dkt. #28) is <u>granted</u>.

---

[2]Plaintiff was a resident of New York but as of January 2011, he had relocated to Connecticut. (<u>See</u> Tr. 99).

[3]Along with his Complaint, plaintiff filed a Motion to Proceed <u>In Forma Pauperis</u> (Dkt. #2), which motion was granted the next day.  (Dkt. #4).

## II. FACTUAL BACKGROUND

### A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING AND EMPLOYMENT HISTORY

Plaintiff was born in 1973; he is thirty-nine years old. (Tr. 126). He was living in a fifth floor apartment with his mother in New York City (Tr. 36-37, 147), but more recently, he moved in with his girlfriend in a first floor apartment in Connecticut.  (Tr.  36-37, 45).  He has one minor son. (See Tr. 44, 186).  Plaintiff completed his GED in 1995 or 1996. (Tr. 37, 131 (1995), 609 (1996)).

Plaintiff reported that he held one job in the last fifteen years, from 1996 through 2006, before he became "unable to work." (Tr. 132; see Tr. 158).  He worked as a truck driver, delivering counter tops, kitchen cabinets, office products, and lumber.  (Tr. 37-38, 132, 159-60).  In this line of work, he walked, stood and sat for four hours in the workday and climbed for one hour.  (Tr. 132, 159-60).  Additionally, he handled large objects and reached for eight hours.  (Id.).  When he delivered kitchen cabinets, counter tops, sheet rock, steel beams, and wood, he lifted over one hundred pounds, and frequently lifted fifty pounds.  (Tr. 132-33, 160-61).  When he worked delivering office products, he frequently lifted fifty pounds.  (Tr. 159).

Plaintiff's pain is concentrated in his head, neck, right shoulder, and left arm, and it radiates down his back and through his chest muscles, and his fingers twitch every few hours.  (Tr. 155-56). According to plaintiff, he has dizziness, "real bad headaches," twitching and numbness in his arms and down his fingers, chest pain, and back and neck pain. (Tr. 38-41).   The pain is worse in his neck and radiates down his left arm.  (Tr. 141).  His right arm is "stiffer and hur[ts] more. It is more difficult to walk and to lift objects with [his] right arm."  (Id.).  Plaintiff reports that he is depressed because of his pain (Tr. 149), and the pain interferes with his ability to pay attention, finish what he starts, and follow spoken or written instructions.  (Tr. 153-54).  However, plaintiff

testified that "[t]hey just want to give me pills. I don't want no [sic] pills."  (Tr. 50).[4]

Plaintiff reports that he has difficulty dressing and putting on shirts and shoes, and has difficulty bathing and shaving because he cannot tip his head back.  (Tr. 144; see Tr. 148 (his mother helps him put on his shirts and sweaters)).  Plaintiff cannot sleep on his right side.  (Tr. 148).  Plaintiff spends his days watching television, laying down, or going to his medical appointments.  (Tr. 44, 148, 151-52).  When his son visits, his mother cares for him, as she does for plaintiff -- preparing meals as plaintiff does not cook.  (Tr. 148-49). "Sometimes" he cleans his own dishes, and his sister helps him with his laundry because he gets dizzy, has headaches, and experiences muscle spasms.  (Tr. 150).  He does not drive because he becomes dizzy, sitting too long hurts his back, and the steering wheel makes his shoulder hurt.  (Id.).  He cannot lift anything "to[o] heavy[,]" and "[e]ven a gallon of milk" triggers the pain.  (Id.).  The most he can lift is about fifteen pounds.  (Tr. 43). According to plaintiff, he can walk five to ten blocks before having to stop because of head pressure and dizziness.  (Tr. 42, 153).  He can stand for fifteen minutes before having to take a seat, and then can sit for fifteen minutes before getting a headache or experiencing pain in his lower back.  (Tr. 43).

Plaintiff testified about his unsuccessful attempt to obtain vocational training to "learn to fix computers" because he could not sit for the three hour class. (Tr. 47).  According to plaintiff, he "would literally go to the bathroom, lock the door and lay flat on the floor because the pain would get so bad and the teacher would just tell me, go home."  (Tr. 47-48).

Plaintiff takes or has taken Lyrica, Diazepam/Valium, Butalbital, Naproxen, Amrix, and Percocet (Tr. 41, 156-57), and he uses heat and ice packs.  (Tr. 157).   He needs reminders to take

---

[4]In a Report of Contact, dated April 29, 2010, SSA noted that plaintiff "went to a psychiatrist once or twice while [he was] insured . . . two or three years ago[,]" and he did not go on medication.  (Tr. 140).

medication. (Tr. 149).

### B. PLAINTIFF'S MEDICAL HISTORY

Plaintiff's relevant medical records begin on June 26, 2003, the date of plaintiff's work-related injury. (Tr. 208).[5] On that date, plaintiff presented to Elmhurst Hospital with a back strain on his right side from lifting a "heavy cabinet." (Tr. 208-12). He reported that he had injured his back a year prior from which he had a bulging disc. (Tr. 209).[6] On July 3, 2003, plaintiff was seen at Metropolitan Hospital Center, with his Workers' Compensation paperwork in hand. (Tr. 683-85).[7] Plaintiff's history of chronic back pain was noted. (Tr. 684-85).[8] On July 16, 2003, plaintiff was seen by Dr. Robert S. Goldstein of Madison Avenue Orthopaedic Associates, P.C., who diagnosed plaintiff with acute cervical sprain, with right scapulocostal syndrome, rule out herniated nucleus pulposus ["HNP"]; acute right bicep tendonitis, and acute lumbrosacral sprain, rule out HNP. (Tr. 293-94). Dr. Goldstein gave plaintiff a steroid injection into the scapulocostal area. (Tr. 294). A week later, Dr. Goldstein referred plaintiff for physical therapy. (Tr. 296). He was seen by Dr. Goldstein in August and September 2003. (Tr. 298-301).

On September 26, 2003, plaintiff underwent an MRI of his cervical spine, which revealed

---

[5]Prior to this, from January to June 2003, plaintiff was seen at the Pain Clinic of Generations + Northern Manhattan Network and Metropolitan Hospital Center for complaints of chronic right sided pain, particularly in his upper arm and neck, and for a disc bulge in his back. (Tr. 661-63, 665-70, 673, 675-78). MRI results in January 2003 revealed straightening of the cervical lordosis compatible with reflex muscle spasm. (Tr. 664). In April 2003, an MRI of the cervical lumbar sacral was "unremarkable" (Tr. 671), but an MRI of the lumbar sacral showed a bulging disc at L5 -S1 touching the thecal sac, with a small area of hyperintensity along the posterior aspect of the superior endplate of L3 "which may represent focal fatty infiltration." (Tr. 672).

Six days before the work accident, plaintiff received a epidural steroid block. (Tr. 679, 681-82).

[6]See note 5 supra.

[7]All of plaintiff's treating providers treated him with regard to his Workers' Compensation claim.

[8]See note 5 supra.

5

no evidence of herniation or spinal stenosis; the MRI results were "[n]ormal." (Tr. 302).  Following

the MRI, Dr. Goldstein treated plaintiff with a steroid injection into his right shoulder, and he opined

that plaintiff is "totally disabled and not working." (Tr. 303).[9]  The results of an October 2003 MRI

of plaintiff's right shoulder revealed a "[s]mall amount of fluid at the subacromial subdeltoid bursa

which may represent bursitis." (Tr. 305).

On October 3, 2003, plaintiff was seen for an independent medical exam ["IME"] (see Tr.

476, 480), by Dr. Kenneth E. Seslowe, who noted "evidence of a mild partial disability[,]" but he

opined that plaintiff "could return to work not requiring lifting of more than [thirty pounds] or

frequent bending." (Tr. 474; see Tr. 473-75).  He opined that plaintiff "should reach maximum

medical improvement in approximately [six] weeks." (Tr. 474).  On November 10, 2003, Dr.

Seslowe added that after reviewing the two MRI reports, he felt that plaintiff "sustained a soft

tissue strain of his neck and a soft tissue strain of his shoulder[,]" and that he should "be able to

return to work in [four] weeks." (Tr. 477).

Plaintiff continued to treat with Dr. Goldstein for his shoulder in November-December 2003

and January 2004. (Tr. 306, 308, 310).  In December 2003, after reviewing Dr. Goldstein's report,

Dr. Seslowe opined that plaintiff should undergo a trial of injections in his shoulder and if he did

not respond, Dr. Seslowe would authorize arthroscopic surgery. (Tr. 479).

On March 3, 2004, plaintiff was seen by Dr. David Pereira as part of a Workers'

Compensation follow-up evaluation for his right shoulder pain. (Tr. 314).  Dr. Pereira scheduled

plaintiff for arthroscopic surgery, which was performed on March 22, 2004. (Tr. 314, 316-18).

Plaintiff was seen at Metropolitan Hospital Center on June 7, 2004 for complaints of shoulder

pain radiating to his neck and head, and right leg pain. (Tr. 687-88).  Plaintiff was seen for an IME

---

[9]See note 7 supra.

with Dr. Steven D. Zaretsky on June 23, 2004, who opined that plaintiff "does not require continued treatment for the cervical or lumbrosacral spine [, as his] examination [was] unremarkable and nonfocal." (Tr. 485; <u>see</u> Tr. 481-87).  He recommended four weeks of physical therapy and he cleared him to return to "light duties as a truck driver" restricted to "avoid lifting greater than [thirty] pounds above the horizontal plane of the right shoulder girdle[,]" and to avoid "repetitive pushing or pulling with the right arm." (Tr. 485).

As of July 2004, plaintiff was "making steady progress with strengthening[]" and continued with physical therapy. (Tr. 319).  On August 30, 2004, Dr. Pereira noted that plaintiff was at a standstill in his recovery because he had been "cut off from physical therapy" but that once he returned to physical therapy, he "should be able to resume his full work activities after four weeks of physical therapy . . . ." (Tr. 321).  On October 8, 2004, Dr. Pereira noted that plaintiff had 5/5 rotator cuff strength and full range of motion with no discomfort, and he set a return to work date of October 18, 2004. (Tr. 323).

Plaintiff returned to Dr. Zaretsky on November 15, 2004 who found that, based upon the Workers' Compensation guidelines, plaintiff had a 10% schedule loss of utilization of the right shoulder due to a mild defect in both internal and external rotation, and he had met maximum medical improvement.  (Tr. 490; <u>see</u> Tr. 488-91). On December 3, 2004, plaintiff was seen by Dr. Christopher Kyriakides of New York Orthopaedic Surgery and Rehabilitation for an evaluation.  (Tr. 214-15, 326-27; <u>see also</u> Tr. 217-22 (spinal range of motion exam)).  Weakness was noted to the right shoulder with "a positive impingement sign and there [was] weakness between 130-90 degrees of abduction." (Tr. 215).  Plaintiff had internal rotation deficits and external rotation weakness, and his cervical spine yielded positive trigger points and somatic dysfunctions, as well as a limited range of motion and a positive Spurling's maneuver elicited to the right side.  (<u>Id.</u>).

Dr. Kyriakides opined that plaintiff needed more physical therapy for his shoulder, and range of motion exercises for his spine.  (Id.).  Writing to the Workers' Compensation Board, Dr. Kyriakides added, "[t]he patient is currently totally disabled."  (Id.).

Plaintiff returned to Dr. Kyriakides on February 4, 2005, complaining of pain in his neck and right shoulder, and twitching in his fingers.  (Tr. 223, 330). Plaintiff still presented with positive somatic dysfunctions and positive trigger points and a positive Spurling's maneuver.  (Id.). According to Dr. Kyriakides, plaintiff still required physical therapy and remained "totally disabled." (Id.).  On April 21, 2005, plaintiff complained of pain that radiated to his extremities without numbness or tingling. (Tr. 332).  On July 13, 2005, plaintiff was reevaluated by Dr. Zaretsky, who noted that plaintiff walked with a normal gait, and had "full and painless[]" range of motion of the cervical spine and upper extremities.  (Tr. 493; see Tr. 492-97).  According to Dr. Zaretsky, plaintiff presented with a "resolved strain/sprain syndrome of the cervical and lumbosacral spine[,]" he had a "mild defect both in internal and external rotation," and a "10% schedule loss of the right shoulder girdle."  (Tr. 495).   Six days later, Dr. Kyriakides noted that plaintiff continued to have restricted range of motion and decreased strength and positive surgical impingement, as well as cervical dysfunction with positive somatic dysfunction in the cervical region.  (Tr. 224).  He was to continue physical therapy, and he remained "totally disabled at [that] time."  (Id.).

On August 18, 2005, plaintiff was seen at the Metropolitan Hospital Center's Emergency Department for complaints of right shoulder pain.  (Tr. 689-92).  He was given Percocet and Vicodin.  (Tr. 690).  Following his emergency room visit, plaintiff was seen by Dr. Kyriakides; upon examination, he had multiple trigger points and somatic dysfunctions with positive Spurling's maneuver to the right reproducing concordant neck and arm pain.  (Tr. 225).  Plaintiff was advised

to continue physical therapy and was given a prescription for Hydrocodone.  (Tr. 225-26).[10]  As of his December 13, 2005 visit to Dr. Kyriakides, physical therapy was still prescribed, and plaintiff continued to have positive trigger points and somatic dysfunctions.  (Tr. 234).

On January 24, 2006, plaintiff was seen by Dr. David Adin, who noted that an MRI study, for which they still awaited approval from the Workers' Compensation Board, could reveal that plaintiff "may necessitate additional surgical intervention to the shoulder." (Tr. 235-36).   Dr. Adin noted that plaintiff had "episodes of depression as a result of the ongoing pain[.]" (Tr. 236).  Dr. Adin's March 8, 2006 treatment note is almost identical to the January 24th entry.  (Tr. 237-38, 344-45).  Plaintiff was seen in April, complaining of moderate to minimal symptoms.  (Tr. 348). He was also seen twice in April at the emergency room of Metropolitan Hospital Center for complaints of "abnormal" shoulder pain, for which he was given Vicodin, Motrin and Robaxin.  (Tr. 694-705).  On May 10, 2006, Dr. Adin noted that plaintiff had been diagnosed with anxiety attacks, he was experiencing "worsening depression[,]" and he "remain[ed] totally disabled from his previous work tasks."  (Tr. 239-40, 351-52; see Tr. 350 (plaintiff seen twice in May, complaining of moderate to minimal symptoms)).

Plaintiff underwent an MRI of his cervical spine and right shoulder on July 12, 2006.  (Tr. 241-42).  The cervical spine MRI revealed C4/5 and C5/6 posterior subligamentous disc bulges (Tr. 241), and the right shoulder MRI revealed "[t]race amount of fluid in the glenohumeral joint. Laterally down sloping acromion with trace amount of subacromial fluid. Suprapinatus tendinosis/tendinopathy."  (Tr. 241)(emphasis omitted).

On September 15, 2006, plaintiff returned to Dr. Adin with complaints of neck pain radiating

---

[10]Plaintiff went through additional range of motion testing in September 2005.  (See Tr. 228-33). The testing revealed a 50% loss of extension of the neck, a 30% loss of shoulder external rotation, and a 40% loss of shoulder flexion.  (Tr. 234).

into his right arm and right hand with numbness and tingling in his hand, and severe right shoulder pain at times primarily with overhead activities. (Tr. 243-44, 357-58). He was prescribed Tramadol and Elavil. (Tr. 244, 358). Dr. Adin again concluded that plaintiff "remains totally disabled at this time. (Id.).

On November 6, 2006, plaintiff presented to Mount Sinai with complaints of right shoulder pain and lower back pain. (Tr. 566-69). Plaintiff had midline tenderness in the upper and lower back area and paraspinal tenderness, along with dizziness and right shoulder pain. (Tr. 568). Plaintiff was given Percocet for the pain. (Tr. 569).

On November 22, 2006, Dr. Adin recommended a cortisone injection to his right shoulder, which plaintiff received on December 8, 2006, and Dr. Adin prescribed Percocet. (Tr. 247-49, 361-63; see Tr. 360 (November 2006, plaintiff complained of "maximal" symptoms)). A radiology report from a cervical spine x-ray taken on March 8, 2007 revealed no bony or disc space pathology, and the "[c]ervical [i]ordotic curvature is straightened[.]" (Tr. 181).

On January 30, 2007, it was noted that plaintiff claimed improvement with therapy with minimal pain relief during his activities of daily living. (Tr. 365). Range of motion studies were done on plaintiff's shoulder on January 31, 2007. (Tr. 250-56). Dr. Adin saw plaintiff again on February 12, 2007 at which time he was prescribed Lyrica. (Tr. 257; see Tr. 368 (February 2007, improvement in therapy with moderate pain relief)). Nerve conduction studies were done on March 28, 2007 which revealed evidence of left cervical radiculopathy. (Tr. 258-65, 371-77).[11]

On May 4, 2007, Dr. Adin noted that plaintiff required "more aggressive treatment to the cervical spine beginning with epidural steroid injections[.]" (Tr. 266, 379). On June 22, 2007, Dr.

---

[11]Plaintiff was seen for other unrelated issues in March 2007  (Tr. 570-74), in May 2007  (Tr. 575-78), in July 2009 (Tr. 585-97), and from September 2009 through March  2010. (Tr. 598-607, 706-78, 780-90).

Adin noted that plaintiff's depression had "clearly worsened" and once again opined that plaintiff "remains totally disabled from his previous work tasks." (Tr. 267, 381). Plaintiff was seen for an IME with Dr. Zaretsky on July 23, 2007 (see Tr. 498-504), during which examination plaintiff was in "no acute distress[,]" although throughout portions of the exam he was "moaning and grimacing." (Tr. 500; see also Tr. 501). Dr. Zaretsky opined that plaintiff's cervical and lumbosacral spine strains were resolved, but "[d]erangement of the right shoulder girdle with possible residual impingement syndrome[]" existed. (Tr. 502). However, Dr. Zaretsky noted that it was difficult "to examine [plaintiff] due to [plaintiff's] inability to allow the examination secondary to his alleged complaints of pain." (Id.). According to Dr. Zaretsky, plaintiff's overall examination concerning the cervical spine and right shoulder girdle "is inconsistent with the objective diagnostic studies." (Id.). Dr. Zaretsky opined that plaintiff is "able to participate in gainful employment[,]" but he should avoid repetitive pushing and pulling with the right shoulder girdle and avoid lifting above the horizontal plane of the shoulder. (Id.). He also recommended that plaintiff undergo a subacromial injection with lidocaine and steroid, followed by a course of physical therapy. (Id.).

On August 22, 2007, plaintiff presented to Mount Sinai with complaints of neck and right shoulder pain. (Tr. 579-84). His shoulder had tenderness to palpitation and limited range of motion. (Tr. 581). He was given an ice pack, Dilaudid and Valium. (Tr. 582-83). On November 1, 2007, plaintiff underwent another IME, this time with Dr. Drew Stein, who concluded that plaintiff had reached maximum medical improvement for his injury and no further orthopedic treatment or physical therapy was needed. (Tr. 505-08).

On January 28, 2008, Dr. Adin noted that plaintiff was there "to return to the work force with the restrictions and limitations as outlined. He will be contacted in the near future for evaluation, training, and placement. He remains totally disabled from his previous work tasks."

(Tr. 268, 384, 614).   Upon referral by Workers' Compensation, plaintiff applied for vocational training services in February 2008, in which application he reported that he gets "bad headaches, dizz[i]ness, nerv[e] [p]ain, cannot sit for long periods of time[, and] cannot [m]ove, [p]ull or [l]ift [h]eavy [o]bjects."  (Tr. 610; see Tr. 629-31).   In plaintiff's health assessment, he reported that he "cannot" reach above his shoulders, pull, carry or lift, he has  "some difficulty" standing, sitting, climbing stairs, squatting, crawling, using his right hand/arm, and pushing, and he has "no difficulty" walking, using his feet or left hand/arm, moving his fingers, hearing, seeing, speaking, reading, doing arithmetic or working with people.  (Tr. 612).   Plaintiff reported to his vocational counselor that his only medical problem was his "severe" neck pain.   (Tr. 623; see Tr. 623-28). However, during his initial evaluation, he also reported a torn rotator cuff, bulging disc, and bone spurs, and cannabis dependence and alcohol dependence were noted.  (Tr. 629; see Tr. 626; see also Tr. 632-37).   In March 2008, it was noted that plaintiff was interested in attending Computer Technician training and was "seeking assistance to identify a permanent flexible employment opportunity."  (Tr. 630-31; see Tr. 642-44).

In April and June 2008, Dr. Adin noted that plaintiff was to follow-up with "vocational rehab and training[,]" and "he remain[ed] totally disabled from his previous work tasks."  (Tr. 269-70, 386).   In a New York State Estimated Physical Capabilities Form, dated April 4, 2008, Dr. Adin opined that plaintiff could sit, stand or walk for four hours with rests, could frequently lift and carry up to ten pounds, and could frequently bend and squat, could occasionally lift and carry up to twenty pounds, and could never carry more than twenty pounds or crawl, climb, run, restrain combative patients, reach above shoulder level, or operate a motor vehicle.  (Tr. 639).  On April 22, 2008, a Vocational Rehabilitation Counselor noted that plaintiff does not take time to consider alternative actions or consequences, has "very few general or personal skills that are transferable

12

to a new job situation[,]" and is limited in his ability to reach.  (Tr. 640-41).

On July 16, 2008, Dr. Charles Kaplan noted that plaintiff "want[ed] to go back to school for computers[,]" and during his appointment, Dr. Kaplan gave plaintiff trigger point injections.  (Tr. 271-72, 388-89).  The injections only provided plaintiff with temporary relief so that Dr. Kaplan prescribed Valium and advised plaintiff to continue physical therapy; Dr. Kaplan also opined that plaintiff was "totally disabled at [that] time."  (Tr. 273, 390).

On August 14, 2008, Dr. Adin testified at a hearing before the State of New York Workers' Compensation Board that plaintiff had tendinosis in the shoulder, and an impingement that caused "a lot of pain and difficulty sleeping on the right side, carrying, [and] lifting things".  (Tr. 530-31; see Tr. 523-43).   Dr. Adin testified that plaintiff should avoid lifting overhead, or any overhead activities, avoid carrying and lifting with his arm dangling, and avoid resting on his elbow.  (Tr. 532).  According to Dr. Adin, plaintiff's prognosis was poor without any further intervention.  (Tr. 534). Dr. Adin opined that at that time, plaintiff was capable of performing a sedentary job.  (Tr. 541).

Just over a month later, on September 23, 2008, Dr. Stein testified before the Workers' Compensation Board that plaintiff's shoulder would have been "maximally improved" two or three years post-surgery, but he recognized that plaintiff would have limitations including no repetitive overhead lifting, and no lifting more than ten to twenty pounds with his right upper extremity.  (Tr. 551, 554; see Tr. 544-63).   Dr. Stein further testified that plaintiff has a moderate disability regarding his shoulder and a mild disability regarding his neck, pursuant to the Workers' Compensation Guidelines.  (Tr. 555, 558).

As of October 31, 2008, plaintiff was in vocational training school, and he continued to complain of "severe pain, as well as increased numbness and a stinging sensation in the fingers of

the right hand."  (Tr. 274, 392).  Dr. Kaplan described plaintiff as "totally disabled at this time."

(Id.).  As of November 2008, his attendance in his PC Technician training course was "[e]xcellent."

(Tr. 645).[12]

On December 1, 2008, plaintiff was seen by Dr. Thomas Scilaris, who diagnosed plaintiff

with a SLAP labral tear of the right shoulder, and requested authorization for arthroscopic surgery

of his right shoulder.  (Tr. 197).  He opined that "[t]he patient remains totally disabled from his line

of work which is driving a truck and lifting."  (Id.).  Plaintiff returned to Dr. Kaplan on December 22,

2008, at which time his Valium was increased and he was advised to continue with physical

therapy; Dr. Kaplan again opined that at that time, plaintiff was "totally disabled."  (Tr. 394).[13]

---

[12]However, in January 2009, his attendance was "[p]oor[,]" or "ok."  (Tr. 646-47).

[13]There are scores of medical records that post-date plaintiff's date last insured, and thus are not relevant to this Court's consideration.  Included therein are the operative reports from plaintiff's right shoulder surgery in February 2009 (Tr. 198-200), and plaintiff's follow-up treatment with Dr. Scilaris (id. at 201-03); treatment records from Dr. Kaplan from April to December 2009, and in January and May 2010, during which time plaintiff was taking two to three doses of Valium a day and was "unable to work due to the injuries" (Tr. 275-78, 281-85, 417-18); treatment records from November 2009 that reflect that plaintiff was on medical leave from his vocational training school  (Tr. 280; see Tr. 648-49, 652-58, 660-64); plaintiff's approval to resume classes in January 2010 (Tr. 655), but plaintiff did not return  (Tr. 656-58); and treatment records from the summer of 2010, when plaintiff was complaining of more frequent headaches and was advised by Dr. Kaplan to follow up with Drs. Adin and Radna for "surgery/interventional procedure."  (Tr. 286-87, 430, 433).  By September 2010, plaintiff was "strongly considering surgery to try and alleviate his pain" (Tr. 288, 434), and in November 2010 and January 2011, Dr. Kaplan opined that plaintiff is "totally disabled."  (Tr. 791, 823).

In July 2009, Dr. Lisa Nason performed an Independent Orthopedic Evaluation of plaintiff, after which she opined that plaintiff could work with a restriction on lifting over twenty-five pounds and avoiding overhead reaching with the right upper extremity.  (Tr. 509-11).  In November 2009, Dr. Adin completed a New York State Estimated Physical Capabilities Form on behalf of plaintiff.  (Tr. 650).  In December 2009 and August 2010, plaintiff underwent additional Independent Orthopedic Evaluations with Dr. Ronald Mann, who first opined in December that plaintiff reached maximum medical improvement and there was no need for further care, and then opined that plaintiff had not reached maximum medical improvement, and may benefit from epidural spine injections.  (Tr. 512-22).  In March, April, May, June and August 2010, plaintiff underwent a neurological consultation by Dr. Maurice Davidson, who recommended surgery for plaintiff's low back pain.  (Tr. 441-72)(see note 16 infra).

On March 11, 2010, plaintiff underwent a lumbosacral spine MRI which revealed a small paracentral herniation at L5-S1.  (Tr. 779).  On October 1, 2010, the Workers' Compensation Board issued a decision granting plaintiff benefits from May 15, 2010 to September 29, 2010 and authorizing surgery for his neck, as well as physical therapy.  (Tr. 792-93).  On November 23, 2010, a MRI of the

C. MEDICAL OPINIONS FROM AGENCY SOURCES

Plaintiff was seen for a psychiatric evaluation on May 17, 2006 by Dr. Paul C. Ladopoulos in connection with his Workers' Compensation Claim.  (Tr. 186-95; see also Tr. 245-46, 435-36).[14] Plaintiff reported depressed mood, anhedonia, low self-esteem, and feelings of helplessness and hopelessness since his work-related accident on June 26, 2003.  (Tr. 186, 245).   His affect was constricted but appropriate. (Tr. 188, 246).  Dr. Ladopoulos' impression was that plaintiff suffered from mood disorder due to his medical condition, and that plaintiff should "[c]ontinue individual supportive psychotherapy coupled with behavior modification in order to aid with coping skills." (Id.).  Plaintiff was taking Zoloft.  (Id.).

On March 8, 2007, plaintiff was seen by Dr. Dyana Aldea at Industrial Medicine Associates, P.C. for a disability determination for SSA.  (Tr. 177-80).   Plaintiff reported to Dr. Aldea that he cooks twice a week and can shower and dress himself, but he cannot help his mother with other household chores because of neck and lower back pain.  (Tr. 178).   His gait was normal, he could walk without difficulty, he needed no help changing for the exam or getting on or off the examining table, and he was able to rise from the chair without difficulty.  (Id.).   His cervical flexion was limited from 0 to 30 degrees, extension limited from 0 to 10 degrees, and there were mild spasms

---

lumbar spine revealed straightening of the lumbar lordosis, and disc dessication and subligamentous protruding disc herniation at the L5-S1 level.  (Tr. 824).

Additionally, copies of the Doctor's Progress Report(s) submitted to Workers' Compensation from Dr. Kaplan in 2009, 2010 and 2011 (Tr. 396-97, 428-29, 431-32, 821-22), Drs. Christoper Kyriakides (Tr. 398-411, 415-16, 421-22), Adin (Tr. 419-20, 423-26), and Scilaris (Tr. 439-40) in 2009 and 2010, from Dr. Davidson in 2010 (Tr. 452-54, 459-60, 465-66, 471-72), and from Dr. Richard Radna in 2010 and 2011 (Tr. 795-98, 803-04, 808-09, 828-29) are included in the record.

On March 8, 2011, plaintiff was seen by Dr. Paul Lerner for an EMG study. (Tr. 815-20).  Dr. Lerner concluded that plaintiff is "totally disabled."  (Tr. 820).  On March 30, 2011, plaintiff underwent a L5/S1 laminotimy/facetectomy/discectomy and stablization under the care of Dr. Radna.  (Tr. 830-54; see Tr. 799-802, 805-07, 810-11, 825-27, 855-60).

[14]Pages 187, 189, 191, 193, and 195 are blank.

of the right trapezius and mild paracervical tenderness to palpitation on the right side.  (Id.).  There

was limited range of motion of the right shoulder secondary to pain, and full flexion in his thoracic

and lumbar spines.  (Tr. 179).  Dr. Aldea opined that secondary to neck and shoulder pain, plaintiff

has mild to moderate limitation for heavy lifting, but no limitations for standing, ambulation,

bending, squatting, climbing, or with upper extremities.  (Tr. 180).[15]

### D. MEDICAL EXPERT AND VOCATIONAL EXPERT TESTIMONY AT PLAINTIFF'S HEARING

Dr. Charles Plotz testified as a medical expert at plaintiff's hearing.  (Tr. 19, 51-62).  Dr.

Plotz began his testimony by referencing a medical record dated April 17, 2003, which predates

plaintiff's onset date of disability.  (See Tr. 51-53 (referencing record that said "[p]ain complaints

apparently out of proportion to physical exam.")).  According to Dr. Plotz, there "is nothing . . . [in]

the record that would require surgery."  (Tr. 54).[16]  He continued that the MRIs have shown

"nothing other than bulging discs[,]" and "[h]aving taking Percocet or its equivalent, [V]icodin, for

several years . . . he is undoubtedly addicted . . . so . . . it's likely that he would be using pain as

a reason to get prescriptions for the medication to which he's addicted.  (Tr. 55).  According to Dr.

Plotz, there is "nothing on the record to indicate anything [suitable] with his left arm . . . . And

nothing that would explain the low back problem[,]" and "nothing from a neurological point of view"

would explain the twitching, dizziness, or headaches.  (Tr. 56).   Dr. Plotz testified that he does not

believe Dr. Radna's diagnosis of plaintiff.  (Tr. 59).  Dr. Plotz also testified that Dr. Radna's findings

upon examination, namely, that plaintiff has significant cervical spasm bilaterally, diffuse tenderness

around the right shoulder, bilateral spasm on the right, and positive bilateral straight leg raising,

---

[15]Additionally included in the record is the first page of a May 3, 2010 Psychiatric Review Technique completed by M. Apacible for SSA, which found insufficient evidence of an affective disorder. (Tr. 176).

[16]At plaintiff's hearing, the ALJ noted that he subpoenaed records from Dr. Davidson, who refused to provide them unless paid a "substantial sum of money." (Tr. 35-36). See Section IV.B. infra.

were consistent with the symptoms to which plaintiff testified at the hearing.  (Tr. 61-62).

The vocational expert then testified that a person limited to simple and routine work tasks, who should avoid overhead or repetitive reaching or pushing and pulling with his right upper extremity could perform light work as a chauffeur, an usher, or a ticket seller, or could perform sedentary work as a surveillance system monitor, locker room attendant, jewelry stone setter, or charge account clerk.  (Tr. 62-63).  However, a person suffering from chronic pain of his back and neck, dizziness, and headaches would not be able to concentrate and focus on the work tasks or perform competitive work, and if a person had to change positions every fifteen minutes, that person also could not perform competitive work. (Tr. 63-64).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual

findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is currently employed, the claim is denied.  See  20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(a)(4)((iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can

perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Levin found that plaintiff has not engaged in substantial gainful activity since June 26, 2003, his onset date of disability, and he met disability insured status through December 31, 2008.  (Tr. 26).  ALJ Levin then concluded that plaintiff has a severe impairment of internal derangements of his right shoulder, but he does not have a severe mental impairment.  (Id.).  ALJ Levin found that during the period of June 26, 2003 through December 31, 2008, plaintiff retained the following  Residual Functional Capacity ["RFC"]: he had no significant limitations for sitting, and could stand or walk for six hours during the course of an eight-hour workday; he was limited to lifting and carrying no more than twenty pounds, mostly using his left arm with the right arm mostly assistive; he had to avoid overhead reaching or repetitive pushing/pulling at the right shoulder; and he was limited to simple and routine work tasks.  (Id.).  The ALJ concluded that during the relevant period, plaintiff was unable to perform his past relevant work, but he could have performed work as a chauffeur, usher, ticket seller, locker room attendant, surveillance system monitor, jewelry stone setter, and charge account clerk.  (Id.).  Accordingly, the ALJ found that plaintiff was not under a disability at any time from June 26, 2003 through December 31, 2008.  (Tr. 27).

Plaintiff moves for an order reversing or remanding this case to the Commissioner on grounds that the ALJ erred in that plaintiff's severe impairments include his back and neck, in

addition to "internal derangements of his right shoulder[,]" (Dkt. #24, Brief at 15-16); the ALJ incorrectly disregarded the opinions of plaintiff's treating physicians while assigning undue weight to Dr. Plotz's testimony (id. at 16-19); the ALJ's RFC evaluation is "fallacious given all of the other errors in the decision" (id. at 19); and an "examination of the onset of disability pursuant to Social Security Ruling ["SSR"] 83-20 was incorrectly avoided when plaintiff's neck and back abnormalities were not found to be 'medically determinable' impairments." (Id. at 19-20).

In response, defendant asserts that substantial evidence supports the ALJ's finding that the right shoulder derangements were plaintiff's only severe impairment as the other impairments did not arise before his date last insured (Dkt. #28, Brief at 3-5); substantial evidence supports the ALJ's assessment of plaintiff's RFC as the ALJ properly considered evidence from plaintiff's treating physicians, properly disregarded statements that plaintiff was totally disabled, and properly gave weight to Dr. Plotz's testimony (id. at 5-8); substantial evidence supports the ALJ's finding that plaintiff's allegations were not credible (id. at 9-11); and the ALJ was not required to do any analysis under SSR 83-20 as the ALJ did not make a finding that plaintiff was disabled within the meaning of the Act at any time.  (Id. at 11-12).

A. MEDICALLY DETERMINABLE IMPAIRMENTS

A claimant seeking social security benefits must bear the burden of showing that he has a medically severe impairment or combination of impairments.  See Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987).  "The severity regulation requires the claimant to show that he has an 'impairment or combination of impairments which significantly limits' 'the abilities or aptitudes necessary to do most jobs.'"  Id. at 146, quoting 20 C.F.R. § 404.1520(c).  An impairment or combination of impairments is "not severe" when "it does not significantly limit [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a); see SSR 85-28, 1985 WL 56856, at

*3 (S.S.A. 1985).[17]

As stated above, ALJ Levin concluded that the only severe impairment that plaintiff has is a severe impairment of internal derangements of his right shoulder. (Tr. 26).  Plaintiff contends that the ALJ "avoided discussion of whether or not [plaintiff's] problems with his neck and back were 'severe' impairments, by [erroneously] finding that these problems did not constitute 'medically-determinable impairments.'" (Dkt. #24, Brief at 15)(citations omitted).  Defendant counters that "[t]here is no medical evidence that [p]laintiff suffered from a severe neck or back impairment during the relevant period . . . ." (Dkt. #28, Brief at 3).

The medical evidence reveals that on plaintiff's onset date of disability, he suffered a back strain on his right side from lifting a "heavy cabinet," and a week later, Dr. Goldstein, an orthopedist, diagnosed plaintiff with, inter alia, an acute cervical sprain, with right scapulocostal syndrome, and acute lumbrosacral sprain.  (Tr. 208, 293-94).  Scapulocostal syndrome is pain in the upper or posterior part of the shoulder radiating into the neck, head, arm, or chest, caused by an abnormal relationship between the scapula and the posterior wall of the thorax.  See http://medical-dictionary.thefreedictionary.com/scapulocostal+syndrome (last visited Jun. 11, 2013).  As defendant appropriately pointed out, the results of an MRI of plaintiff's cervical spine, taken on September 26, 2003, were "[n]ormal." (Tr. 302).  Thereafter, plaintiff underwent surgery on his shoulder on March 22, 2004.  (Tr. 314, 316-18).

Two months later after the shoulder surgery, plaintiff complained of shoulder pain radiating to his neck and head (Tr. 687-88), but at the same time, Dr. Zaretsky opined that plaintiff "does

---

[17]"Basic work activities" are the "abilities and aptitudes necessary to do most jobs[,]" and include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).

not require continued treatment for the cervical or lumbrosacral spine[, as his] examination [was] unremarkable and nonfocal." (Tr. 485). He cleared plaintiff to return to "light duties as a truck driver" but to avoid lifting more than thirty pounds and avoid repetitive pushing and pulling with the right arm. (Id.). Similarly, in October 2004, Dr. Pereira noted that plaintiff had a full range of motion with no discomfort, and he too cleared plaintiff to return to work, as of October 18, 2004. (Tr. 323). In November 2004, Dr. Kyriakides also noted positive trigger points in plaintiff's cervical spine, and recommended range of motion exercises for his spine. (Tr. 215).

In February 2005, plaintiff complained to Dr. Kyriakides of pain in his neck (Tr. 223, 330), but by July 2005, Dr. Zaretsky noted that plaintiff had full and painless range of motion of the cervical spine and upper extremities, such that he opined that plaintiff had a resolved strain/sprain syndrome of the cervical and lumboscaral spine. (Tr. 500-02). In August 2005, Dr. Kyriakides noted neck and arm pain (Tr. 225-26); during the first half of 2006, plaintiff primarily sought treatment for shoulder pain, with a lesser emphasis on his neck pain. (See Tr. 236-38, 344-45, 348, 694-705).

An MRI of plaintiff's cervical spine, taken on July 12, 2006, revealed C4/5 and C5/6 posterior subligamentous disc bulges (Tr. 241), and in September 2006, plaintiff complained to Dr. Adin of neck pain radiating into his right arm and right hand. (Tr. 243-44, 357-58). In November 2006, plaintiff presented to Mount Sinai with midline tenderness in the upper and lower back area and paraspinal tenderness. (Tr. 568).

A radiology report from a cervical x-ray taken on March 8, 2007 revealed no bony or disc space pathology, and the "[c]ervical [i]ordotic curvature [was] straightened." (Tr. 181). Nerve conduction studies were done on March 28, 2007, which revealed evidence of left cervical radiculopathy (Tr. 258-65, 371-77), and on May 4, 2007, Dr. Adin noted that plaintiff required more

aggressive treatment to the cervical spine beginning with epidural steroid injections.  (Tr. 266, 379).  However, plaintiff was seen for an IME with Dr. Zaretsky on July 23, 2007 (see Tr. 498-504), after which Dr. Zaretsky opined that plaintiff's cervical and lumbosacral spine strains were resolved, and the only remaining issue was the derangement of the right shoulder girdle with possible residual impingement syndrome. (Tr. 502).  Notably, according to Dr. Zaretsky, plaintiff's overall examination concerning the cervical spine and right shoulder girdle was "inconsistent with the objective diagnostic studies."  (Id.).   Dr. Zaretsky opined that plaintiff is "able to participate in gainful employment[,]" but he should avoid repetitive pushing and pulling with the right shoulder girdle and avoid lifting above the horizontal plane of the shoulder.  (Id.).

A month later, plaintiff presented to Mount Sinai with complaints of neck and right shoulder pain (Tr. 579-84), but after his November IME with Dr. Stein, Dr. Stein concluded that plaintiff had reached maximum medical improvement for his injury and no further orthopedic treatment or physical therapy was needed.  (Tr. 505-08).   Similarly, on January 28, 2008, Dr. Adin noted that plaintiff was there "to return to the work force with the restrictions and limitations . . . ." (Tr. 268, 384, 614).  While plaintiff reported to his vocational counselor in February 2008 that his only medical problem was his "severe" neck pain  (Tr. 623; see Tr. 623-28), the medical record lacks support for this claim, and a claimant's statements of symptoms alone are insufficient to establish the presence of a medically determinable impairment.  20 C.F.R. § 404.1528(a).

In August 2008, Dr. Adin's testimony before the Workers' Compensation Board focused on plaintiff's tendinosis in the shoulder, and an impingement that was causing "a lot of pain and difficulty sleeping on the right side, carrying, [and] lifting things".  (Tr. 530-31; see Tr. 523-43). At that time, Dr. Adin opined that plaintiff was capable of performing a sedentary job.  (Tr. 541). Just over a month later, on September 23, 2008, Dr. Stein testified before the Workers'

Compensation Board that plaintiff had a moderate disability regarding his shoulder and a mild disability regarding his neck, pursuant to the Workers' Compensation Guidelines. (Tr. 555, 558).[18]

Thus, the medical evidence does not support a finding that plaintiff's neck or back pain significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).[19]  Rather, the evidence supports a finding that plaintiff has limitations in his ability to lift and carry and he must avoid overhead reaching or repetitive pushing/pulling at the right shoulder, all of which is accounted for in the ALJ's RFC determination. (See Tr. 26).  Moreover, it is harmless error for an ALJ to fail to find an impairment severe as long as the ALJ determines that at least one of the claimant's impairments are severe, and then continues with the remaining steps of the analysis. Maziarz v. Sec'y of Health & Human Svs., 837 F.2d 240, 244 (6th Cir. 1987); see Swartz v. Barnhart, 188 Fed. Appx. 361, 368 (6th Cir. 2006)(citation omitted)(it is harmless error "as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity.")(citing Maziarz); see also Jones-Reid v. Astrue, 3:10 CV 1497(WWE)(HBF), 2012 WL 7808094, at *19-20 (D. Conn. May 14, 2013), approving and adopting Magistrate Judge's opinion (following the lead of other circuit courts, the Court observed that "[a]t step two, if the ALJ finds

_____

[18]Although plaintiff's counsel limits her support for her argument on some, but not all of the foregoing evidence, she also relies on the "stellate ganglion block given to [plaintiff] at the Metropolitan Hospital Center" (Dkt. #24, Brief at 16, citing Tr. 665) which was administered to plaintiff on September 6, 2002, almost a year prior to his onset date of disability, and thus outside the relevant period for this Court's consideration.

[19]Additionally, plaintiff contends that the ALJ relied upon Dr. Plotz's reference to plaintiff's testimony that "pains in right upper extremity and neck probably are related to his industrial injury[,]" but failed to include plaintiff's "neck abnormalities as a 'medically determinable impairment'" even though the ALJ relied on Dr. Plotz's testimony for "many of his other conclusions." (Dkt. #24, Brief at 16; Tr. 56).  However, Dr. Plotz's testimony on this one issue is hardly definitive, as Dr. Plotz testiifed that the "pains . . . probably are related to his industrial injury." (Tr. 56)(emphasis added).  See 20 C.F.R. § 404.1527(a)(2)(a conditional statement is not a diagnosis of impairment; rather, medical opinions are "judgments about the nature and severity" of a claimant's impairments).

an impairment is severe, 'the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.'")(citation omitted), aff'd, 515 Fed. Appx. 32 (2d Cir. 2013).

### B. ALJ'S TREATMENT OF MEDICAL OPINIONS

#### 1. OPINIONS THAT PLAINTIFF IS "TOTALLY DISABLED"

Plaintiff contends that the ALJ violated the directive of the Second Circuit that "[w]hile the determination of another governmental agency that a Social Security disability benefits claimant is not binding on the Secretary, it is entitled to some weight and should be considered." (Dkt. #24, Brief at 17, quoting Cutler v. Weinberger, 516 F.2d 1282, 1286 (2d Cir. 1975)). In Cutler, a case decided thirty-eight years ago, the Second Circuit had referred to the determination of the Department of Social Services, id. at 1285-86, not to the Workers' Compensation Board, as here. In contrast to Cutler, statements by a plaintiff's treating providers that a claimant is "totally disabled" "made in the context of a state workers' compensation claim[] . . . are not dispositive of a claim made under Social Security." Leaverton v. Colvin, No 11-CV-778-FHM, 2013 WL 1316901, at *4 (N.D. Okla. Mar. 29, 2013). "In a workers' compensation evaluation, the issue is a claimant's capacity to perform work existing with a particular employer[,]" whereas in the Social Security context, "the issue is the claimant's residual functional capacity to perform work that exists in the much broader, national economy." Id.; see Seever v. Barnhart, 188 Fed. Appx. 747, 753 (10th Cir. 2006); see also Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)("The inquiry in Social Security benefits cases is not whether the claimant is able to perform the duties of her previous job, but whether the claimant is able to perform the duties associated with her previous 'type' of work.")(citation omitted). Accordingly, "[w]hile a workers' compensation finding of temporary total disability may have some value in assessing the [RFC] of a Social Security claimant, it cannot be

given controlling weight[,]" but rather is afforded "only some weight." Leaverton, 2013 WL 1316901, at *4.  "Moreover, some kinds of findings--including the ultimate finding of whether a claimant is disabled and cannot work--are reserved to the Commissioner. . . . [T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999)(internal citations & quotations omitted); 20 C.F.R. § 404.1527(d).  Thus, the determination of whether a claimant is disabled is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d).

In this case, the findings of Drs. Kyriakides, Adin and Kaplan that plaintiff is "totally disabled" were made in the context of workers' compensation evaluations, and thus were limited to whether plaintiff could resume his previous work as a truck driver, with heavy lifting duties.  The ALJ's decision at step four that plaintiff was unable to perform his past relevant work is in accord with the doctors' conclusions.  (See Tr. 26). Accordingly, the ALJ did not err in failing to rely on, or assign great weight to, the opinions that plaintiff is "totally disabled."

## 2. RELIANCE ON THE OPINION OF THE MEDICAL EXPERT

Plaintiff argues that the ALJ violated the treating physician rule by relying on Dr. Plotz's opinion regarding plaintiff's cervical and lumbar abnormalities, rather than on the opinions of Drs. Davidson and Radna.  (Dkt. #24, Brief at 17-19).  Defendant appropriately counters that although Drs. Davidson and Radna eventually treated plaintiff, they treated him "well after [p]laintiff's [date last insured]." (Dkt. #28, Brief at 7-8).  As the record evidences, plaintiff's date last insured was December 31, 2008, and plaintiff did not begin treatment with Dr. Davidson until March 2010, and with Dr. Radna until October 2010, almost two years later. (See Tr. 441-43, 795-802).

Dr. Plotz's testimony as to plaintiff's cervical and lumbar abnormalities was sweeping, yet also concise, blunt, and unsympathetic.  (Tr. 54-56)("There is nothing I can see on the record that

would require surgery[;]" Dr. Radna's plan "to do surgery on the neck or on the lumbrosacral spine" is "extraordinary"; there is nothing in the record to indicate anything with plaintiff's left arm, and nothing to cause twitching, dizziness or headaches).  That said, although his delivery may have been harsh, the underlying medical record supports his conclusion.

The results of the MRI taken in September 2003, on the heels of plaintiff's initial work injury, were "[n]ormal." (Tr. 302). After reviewing two MRI reports in November 2003, Dr. Seslowe limited plaintiff's impairments to a soft tissue strain of his neck and shoulder, but opined that plaintiff could return to work in four weeks.  (Tr. 477).  In June 2004, after plaintiff had complained of shoulder pain radiating into his neck, Dr. Zaretsky opined that plaintiff "does not require continued treatment for his cervical or lumbrosacral spine [, as his] examination [was] unremarkable and nonfocal." (Tr. 485).  In October 2004, Dr. Periera set a return to work date for plaintiff for later that month.  (Tr. 323).  While plaintiff complained  to Dr. Kyriakides of pain in his neck and twitching in fingers in 2005, Dr. Kyriakides opined that plaintiff's sprain/strain in his cervical and lumbosacral spine were "resolved[.]" (Tr. 495).  Although plaintiff complained of his ongoing pain in 2006, and underwent an MRI of the cervical spine that revealed C4/5 and C5/6 posterior subligamentous disc bulges, there was no recommendation for surgery at that time or through plaintiff's date last insured.  (See Tr. 241, 243-44, 357-58).  However, contrary to Dr. Plotz's opinion that there was no medical support for plaintiff's complaints, as of March 2007, nerve conduction studies revealed evidence of left cervical radiculopathy, and in May 2007, Dr. Adin opined that plaintiff required more aggressive treatment to the cervical spine beginning with epidural steroid injections. (Tr. 266, 379).  Yet, in support of Dr. Plotz's opinion, Dr. Zaretsky noted in July 2007 that plaintiff's examination concerning the cervical spine, during which plaintiff "alleged complaints of pain[,]" are "inconsistent with the objective diagnostic studies." (Tr. 502).  Dr. Zaretsky opined that plaintiff could work with

limitations.  (Id.).  Similarly, Dr. Stein opined in November 2007, that no further orthopedic

treatment or physical therapy was needed (Tr. 505-08), and two months later, Dr. Adin noted that

plaintiff could return to work with restrictions, although not as a truck driver.  (Tr. 268, 384, 614).

In August 2008, Dr. Adin testified at plaintiff's Workers' Compensation hearing that plaintiff is

capable of performing sedentary work with restrictions, and a month later, Dr. Stein echoed those

work-related restrictions and noted a "moderate disability" regarding plaintiff's shoulder and only

a "mild disability" regarding his neck.  (Tr. 541, 554-58).  Thus, in light of the foregoing evidence,

the ALJ's reliance on Dr. Plotz's opinion was appropriate as it was supported by the substantial

evidence of record applicable to the period between plaintiff's onset date and date last insured.

### C. CREDIBILITY ASSESSMENT

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an

independent judgment, in light of medical findings and other evidence . . . ."  Marcus v. Califano,

615 F.2d 23, 27 (2d Cir. 1979).  When assessing a claimant's credibility, an ALJ is required to

consider (1) the medical signs and laboratory findings; (2) the diagnoses, prognoses, and medical

opinions provided by the medical sources; and (3) statements and reports from the individual and

from treating or examining physicians and psychologists and others about the claimant's medical

history, treatment and response, prior work record, efforts to work, daily activities, and other

information concerning the claimant's symptoms and how they affect the claimant's ability to work.

SSR 96–7p, 1996 WL 374186, at *5 (July 2, 1996). "After weighing any existing inconsistencies

between the plaintiff's testimony of . . . limitations and the medical evidence, the ALJ may discount

the plaintiff's subjective testimony with respect to the degree of impairment."  Romano v. Apfel,

No. 99 CIV. 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citations omitted).  Thus,

an ALJ is entitled to make a determination that the claimant's subjective complaints of pain are

inconsistent with the objective medical evidence, see 20 C.F.R. § 404.1529(a); see also Reyes v.

Astrue, No. 3:11 CV 1403(AVC), 2013 WL 696498, at *5 (D. Conn. Feb. 26, 2013); however, if an ALJ discredits a plaintiff's testimony, he or she must do so with sufficient specificity. Romano, 2011 WL 199414, at *6 (citation omitted).

In addition to considering medical signs and laboratory findings, diagnosis, prognosis, other medical opinions, and statements from the claimant and from treating or examining physicians, the ALJ "must also consider [his] own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p, 1996 WL 374186, at *5. In accord with the foregoing, in his decision, the ALJ noted that plaintiff's "behavior and demeanor at the hearing were highly histrionic[]" in that he grimaced and shifted and squirmed before and after he was questioned, but once the questioning began, his "demeanor completely changed[]" and he sat "without the slightest sign of discomfort, looked perfectly comfortable, moved easily, and generally looked perfectly well."  (Tr. 22).  Reviewing courts "show 'special deference' to credibility determinations made by the ALJ, 'who had the opportunity to observe the witnesses' demeanor.'" Tarsia v. Astrue, 418 Fed. Appx. 16, 19 (2d Cir. 2011)(citation omitted).  Additionally, as discussed above, and as the ALJ mentioned in his decision, in July 2007, Dr. Zaretsky noted that throughout portions of the examination plaintiff was "moaning and grimacing" (Tr. 500), he was unable to perform mechanical testing due to plaintiff's complaints of pain, and the overall examination concerning the cervical spine and right shoulder girdle was inconsistent with the objective diagnostic studies.  (Tr. 502).[20]  It is within the province of the ALJ to consider whether there are any "inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence[.]" 20 C.F.R. § 404.1529(c)(4).

---

[20]However, while the ALJ could also consider Dr. Plotz's opinion that plaintiff's behavior and complaints were likely partially due to his addiction to pain medications, there is no references in the record by any medical provider suggesting that plaintiff was, in fact, addicted, or was engaged in drug seeking behavior. (See Dkt. #28, Brief at 11).

Thus, the ALJ appropriately noted plaintiff's complaints of pain, and the lack of objective support for such pain as noted in the record.  Accordingly, there was substantial evidence to support the ALJ's negative credibility assessment.[21]

### D. APPLICATION OF SSR 83-20

Plaintiff erroneously contends that "an examination of the onset of disability pursuant to SSR 83-20 was incorrectly avoided when [plaintiff's] neck and back abnormalities were not found to be 'medically determinable' impairments."  (Dkt. #24, Brief at 19).[22]  Plaintiff bases his argument on the erroneous reading of the ALJ's decision, namely that the "ALJ conceded that [plaintiff] was 'totally disabled' when he was being treated by Dr. Radna."  (Id.).   However, the ALJ never "conceded" that Dr. Radna considered plaintiff totally disabled.  The ALJ instead observed:

---

[21]Plaintiff posits a three sentence argument that the ALJ's RFC evaluation is "fallacious given all the errors in the decision[,]" (Dkt. #24, Brief at 19), to which argument defendant does not respond.  As discussed above, plaintiff's doctors repeatedly opined that plaintiff could return to work with limitations, and such limitations were included in the ALJ's RFC determination (Tr. 26), beyond those listed by Dr. Plotz. (See Tr. 25).

[22]While medical records "containing the descriptions of examinations or treatments of the individual are basic to the determination of the onset of disability[,]" there are cases in which precise evidence is not available so that there is a "[n]eed for [i]nferences." SSR 83-20, 1983 WL 31249, at *2-3 (S.S.A. 1983).  As explained in SSR 83-20, in "disabilities of nontraumatic origin[,]" it may be possible to infer the onset date of disability.  Id. at *2-3.  Such an inference may be based on either an "informed judgment of the facts of the particular case . . . [grounded in] a legitimate medical basis[,]" or from "other sources of documentation." Id.   In the former situation, an ALJ "should call on the services of a medical [expert] when [the] onset [date of disability] must be inferred[, and if] there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made." Id. As stated in SSR 83-20:

> If reasonable inferences about the progression of the impairment cannot be made on the basis of evidence in [the] file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation.  Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.  However, before contacting these people, the claimant's permission must be obtained.  The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record.

SSR 83-20, at *3.

> Until relatively recently, none of [plaintiff's] treating doctors has considered him to be totally disabled as that term is defined in the Social Security Act.  It may be that his present neurosurgeon, Richard Radna, M.D., is now doing so (though it is unclear what his "100% disabled" means for all work or just for previous work), but I need not discuss that in detail because Dr. Radna did not begin to treat [plaintiff] until well after his [date last insured]."

(Tr. 23)(emphasis added).  Additionally, even if this statement may be read as the ALJ concluding that Dr. Radna opined that plaintiff is presently disabled within the meaning of the Act, there is no support for asserting that the ALJ reached the same conclusion.  Accordingly, the ALJ was not required to determine an onset date of disability under SSR 83-20.

### V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Reversal and/or Remand of the Commissioner's Decision (Dkt. #24) is denied, and defendant's Motion to Affirm (Dkt. #28) is granted.

The parties are free to seek the district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 8th day of October, 2013.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge